Whatt H. BROWN and Thomas W. Williams, Plaintiffs,

v.

Hector DeBRUHL, as Sheriff of Kershaw County, S.C., and S. J. Pratt, as Chairman and M. S. Ingram, and C. H. Lowder, as the South Carolina Alcoholic Beverage Control Commission, Defendants.

Civ. A. No. 78–1946.

United States District Court,
D. South Carolina,
Columbia Division.

Jan. 19, 1979.

---

Jack McGuinn, and Patrick Treacy, Columbia, S.C., for the plaintiffs.

William R. Byars, Camden, S.C., Daniel R. McLeod, Atty. Gen. for the State of South Carolina, C. Tolbert Goolsby, Jr., Deputy Atty. Gen. for the State of South Carolina, and James M. Holly, Staff Atty. for the State of South Carolina, Columbia, S.C., for Hector DeBruhl, Sheriff of Kershaw County, S.C.

Edwin E. Evans, Asst. Atty. Gen., and Robert D. Cook, Staff Atty. for the State of South Carolina, Columbia, S.C., for S. J. Pratt, M. S. Ingram and C. H. Lowder, as the South Carolina Alcoholic Beverage Control Commission.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

HEMPHILL, District Judge.

This Order treats two separate motions for summary judgment filed in this action. On December 29, 1978, defendants Pratt, Ingram and Lowder as Commissioners of the South Carolina Alcoholic Beverage Commission filed a motion for summary judgment.[1] On January 15, 1979, defendant DeBruhl, Sheriff of Kershaw County, moved for summary judgment. Upon consideration of oral arguments heard on January 16, 1978 and written memoranda submitted by counsel, both motions are ripe for decision.

The material facts are not in dispute. Plaintiffs bring this action for money damages pursuant to 42 U.S.C. §§ 1981, 1982 and 1983[2] alleging a conspiracy among defendants under color of state law to deny plaintiffs a sale and consumption license to sell alcoholic beverages as a nonprofit corporation. In October or November 1973, plaintiffs purchased a business known as the Saddle House Club in Kershaw County, South Carolina. Plaintiffs had a corporation to operate and manage the club to be

---

1. See Rule 56 of the Federal Rules of Civil Procedure.

2. 42 U.S.C. § 1981 provides: Equal rights under the law

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1982 provides: Property rights of citizens

All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.

42 U.S.C. § 1983 provides: Civil action for deprivation of rights

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

known as the Mark IV Club. Shortly thereafter, plaintiffs sought a sale and consumption license from the South Carolina Alcoholic Beverage Control Commission that would allow them to serve liquor by the drink seven days a week.[3] On December 18, 1973, plaintiff Williams was notified by the Commission that there would be a hearing before the full commission upon plaintiffs' application for a liquor license. The hearing was held on January 2, 1974.

The granting of liquor licenses is a proceeding regulated by state law. The Alcoholic Beverage Control Commission is vested with authority to determine what licenses will be granted. The procedure is well defined in the following statutes:

Section 61–3–110 of the South Carolina Code of Laws (1976) provides:

[T]he Alcoholic Beverage Control Commission may hold and conduct hearings, issue subpoenas requiring the attendance of witnesses and the production of records, memoranda, papers and other documents for consideration at such hearings or before any officer or agent of the Commission and administer oaths and take testimony thereunder . . .

An adversarial proceeding is assured by § 61–5–60 which mandates that:

Upon the written request of any person who resides in the county where the license is requested to be granted, the Commission shall not issue such license until any interested person has been given an opportunity to be heard.

Further, § 61–5–90 requires that:

Before the Alcoholic Beverage Control Commission shall refuse to grant any license . . . issued under the provisions of this article, at least ten days notice of such proposed or contemplated action by the Commission shall be given to the applicant . . . The notice shall be in writing and shall contain a statement of the grounds or reason of the proposed or contemplated action of the Commission and shall be served upon the applicant . . . in person or by certified mail . . . The Commission shall in such notice appoint a time and place when and at which the applicant . . . shall at such time and place have the right to produce evidence in his behalf and to be represented by counsel.[4]

A written protest dated December 10, 1973, was submitted to the Commission stating that the business was located too close to a church and that there were not enough police officers on duty to police the business properly on Sunday. The written protest was signed by Sheriff DeBruhl and five other persons. Section 61–5–60, Code of Laws of South Carolina (1976), previously alluded to, assures that "any interested person will be given an opportunity to be heard" prior to the issuance of a license.

A hearing was held before the South Carolina Alcoholic Beverage Control Com-

---

**3.** Plaintiffs apparently sought the license provided for under § 61–5–20(3) Code of Laws of South Carolina (1976) which provides: When transportation, possession and consumption is lawful; sale and consumption in containers of two ounces or less.

Notwithstanding any other provision of law, it shall be lawful, subject to the provisions of § 61–5–30, for any person who is twenty-one years of age or older to transport, possess or consume lawfully acquired alcoholic liquors in accordance with the following:
(3) Nonprofit organizations with limited membership, not open to the general public, established for social, benevolent, patriotic, recreational or fraternal purposes may be licensed to sell alcoholic liquors and beverages in sealed containers of two ounces or less. Members or guests of members of such organi-

zations may consume alcoholic liquors and beverages sold in such containers upon the premises between the hours of ten o'clock in the morning and two o'clock on the following morning.

**4.** For other provisions of South Carolina law which make the licensing procedure closely akin to a judicial proceeding, *see:* Code of Laws of South Carolina, § 61–3–770 (1976); R–7–3, Rules and Regulations of the South Carolina Alcoholic Beverage Control Commission, Code of Laws of South Carolina, (1976); R–7–46, Rules and Regulations of the South Carolina Alcoholic Beverage Control Commission, Code of Laws of South Carolina, (1976); R–7–94, Rules and Regulations of the South Carolina Alcoholic Beverage Control Commission, Code of Laws of South Carolina, (1976).

mission on January 2, 1974. Commissioners Pratt, Lowder and Ingram presided. Sheriff DeBruhl was the spokesman for the protestants. Sheriff DeBruhl testified that a church was located a short distance from the business and that he understood that the applicant could operate on Sunday if the license was granted (Tr. p. 2). He stated that the closest person to the business was about 100 to 125 feet away (Tr. p. 4), and that he discouraged two prior owners from applying for the type of license sought by plaintiff (Tr. p. 4). The two applicants are black and the prior operators were white (Tr. p. 6). Sheriff DeBruhl tried to explain the laws to plaintiffs and explain that the type of people hanging around their club could present law enforcement problems (Tr. p. 15). The club was frequented by men who dress as women (Tr. p. 15) and convicted drug pushers (Tr. p. 16).

The liquor license was denied to plaintiffs on January 4, 1974. Plaintiffs filed this action on November 15, 1978.

Plaintiffs submit that Sheriff DeBruhl and the Commission conspired to deny plaintiffs the license solely based upon their race. It is not disputed that the Mark IV Club had a permit to sell beer and wine issued to Thomas Williams on December 11, 1973.

Defendant Commissioners allege that summary judgment is proper in this instance as a matter of law as the acts of the Commission in denying the license are quasi-judicial in nature thereby rendering the Commissioners immune from suit. It appears that Title 61 of the Code of Laws of South Carolina (1976), previously alluded to, provides an adversary context for these hearings. Plaintiffs took advantage of this with plaintiff Williams, aided by this attorney, testifying to obtain the license. Sheriff DeBruhl testified against its issuance. After a hearing where both points of view were represented, the Commission denied plaintiffs their license stating that the location was unsuitable.

Section 61–5–90 South Carolina Code of Laws (1976) provides for judicial review of the Commission's findings. Plaintiff Williams filed a petition seeking appellate review of the Commission's findings, but the appeal was later abandoned.

The court must inquire into the parameters of judicial immunity and ascertain whether it is applicable. It is an absolute defense, and, if applicable, defendants will be entitled to summary judgment. The Supreme Court in *Bradley v. Fisher*, 13 Wall. (80 U.S.) 335, 20 L.Ed. 646 (1872) held that judicial immunity applied to any action taken by a judge which was judicial in nature and was not performed in clear absence of all jurisdiction. The Court reaffirmed this doctrine in *Stump v. Sparkman*, 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978) holding:

> A judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors. The court made this point clear in *Bradley,* 13 Wall., at 357, 20 L.Ed. 646, where it stated that "This erroneous manner in which [the court's] jurisdiction was exercised, however it may have affected the validity of the act, did not make the act any less a judicial act; nor did it render the defendant liable to answer in damages for it at the suit of the plaintiff, as though the court had proceeded without having any jurisdiction whatever."

The case of *Pierson v. Ray,* 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) held that 42 U.S.C. § 1983 was not intended to abrogate the immunity of state judges which existed under the common law and which the court held applicable to federal judges in *Bradley v. Fisher, supra.* This doctrine also applies to suits under 42 U.S.C. § 1981, *Cruz v. Skelton,* 502 F.2d 1101 (5th Cir. 1974) and § 1982. *Holton v. Bowman,* 493 F.2d 1176 (7th Cir. 1974).

The instant action involves the actions of the Commissioners of the South Carolina Alcoholic Beverage Control Commission acting in their official capacity under color of state law. The action of granting or denying a liquor license is one of the powers

granted to them under State law.[5] *Terry v. Pratt,* 258 S.C. 177, 187 S.E.2d 884 (1972). The issue in this case is whether the Commissioners, in making a decision to deny a liquor license, are to be accorded judicial immunity for purposes of an action under 42 U.S.C. §§ 1981, 1982 and 1983. If the Commission is entitled to immunity, then the lawsuit will fail. *Pierson v. Ray, supra.*

The Supreme Court in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) recently addressed a similar issue and sheds illumination into the morass of the circuits conflicting viewpoints. In *Economou,* plaintiff brought suit against several federal officials alleging damages for violations of constitutional rights. The District Court held that defendants were entitled to absolute immunity. The Court of Appeals reversed holding that they were only entitled to a qualified immunity. The Supreme Court vacated the Court of Appeals judgment and remanded the case. The court held (1) in a suit for damages arising from unconstitutional action, federal executive officials exercising discretion were entitled only to qualified immunity, subject to those exceptional situations where it is demonstrated that absolute immunity is essential for the conduct of the public business; (2) under the principle of qualified immunity for constitutional violations, federal officials would not be liable for mere mistakes in judgment, whether the mistake was one of fact or law; and (3) federal hearing examiners or administrative law judges, agency officials responsible for initiating or continuing a proceeding subject to agency adjudication, and agency attorneys who arranged for the presentation of evidence in the record were *absolutely immune* from suits.

In holding hearing examiners and administrative law judges absolutely immune from suit, the court stated:

We think that adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages. The conflicts which federal hearing examiners seek to resolve are every bit as fractious as those which come to court. As the *Bradley* opinion points out, "When the controversy involves questions affecting large amounts of property or relates to a matter of general public concern, or touches the interests of numerous parties, the disappointment occasioned by an adverse decision often finds vent in imputations of [malice]." 13 Wall. (80 U.S.), at 348, 20 L.Ed. 646. Moreover, federal administrative law requires that agency adjudication contain many of the same safeguards as are available in the judicial process. The proceedings are adversarial in nature. See 5 U.S.C. § 555(b) [5 U.S.C.S. § 555(b)]. They are conducted before a trier of fact insulated from political influence. See id., at § 554(d). A party is entitled to present his case by oral or documentary evidence, id., at § 556(d), and the transcript of testimony and exhibits together with the pleadings constitutes the exclusive record for decision. Id., at § 556(e). The parties are entitled to know the findings and conclusions on all of the issues of fact, law or discretion presented on the record. Id., at § 557(c).

There can be little doubt that the role of the modern federal hearing examiner or administrative law judge within this framework is "functionally comparable" to that of a judge. His powers are often, if not generally, comparable to those of a trial judge: he may issue subpoenas, rule on proffers of evidence, regulate the course of the hearing, and make or recommend decisions. See id., at § 556(c). More importantly, the process of agency

---

5. § 61–5–40, Code of Laws of South Carolina (1976) provides: Application for license to sell in containers of two ounces or less.

Any person making application for a license under subsections (3) and (4) of § 61–5–20 shall submit his application to the Alcoholic Bever-age Control Commission. The Commission shall have the exclusive authority in issuing any license, or in renewing, suspending or revoking any license, pursuant to the provisions of this article.

adjudication is currently structured so as to assure that the hearing examiner exercises his independent judgment on the evidence before him, free from pressures by the parties or other officials within the agency. Prior to the Administrative Procedure Act, there was considerable concern that persons hearing administrative cases at the trial level could not exercise independent judgment because they were required to perform prosecutorial and investigative functions as well as their judicial work, see, e. g., *Wong Yang Sung v. McGrath,* 339 U.S. 33, 36–41, 70 S.Ct. 445, 94 L.Ed. 616 (1950), and because they were often subordinate to executive officials within the agency, see *Ramspeck v. Federal Trial Examiners Conference,* 345 U.S. 128, 131, 73 S.Ct. 570, 97 L.Ed. 872 (1953). Since the securing of fair and competent hearing personnel was viewed as "the heart of formal administrative adjudication," Final Report of the Attorney General's Committee on Administrative Procedure 46 (1941), the Administrative Procedure Act contains a number of provisions designed to guarantee the independence of hearing examiners. They may not perform duties inconsistent with their duties as hearing examiners. 5 U.S.C. § 1305 [5 U.S.C.S. § 3105]. When conducting a hearing under § 5, a hearing examiner is not responsible to or subject to the supervision or direction of employees or agents engaged in the performance of investigative or prosecution functions for the agency. Id., at § 554. Nor may a hearing examiner consult any person or party, including other agency officials, concerning a fact at issue in the hearing, unless on notice and opportunity for all parties to participate. Ibid. Hearing examiners must be assigned to cases in rotation so far as is practicable. Id., at § 3105. They may be removed only for good cause established and determined by the Civil Service Commission after a hearing on the record. Id., at § 7521. Their pay is also controlled by the Civil Service Commission.

In light of these safeguards, we think that the risk of an unconstitutional act by one presiding at an agency hearing is clearly outweighed by the importance of preserving the independent judgment of these men and women. *We therefore hold that persons subject to these restraints and performing adjudicatory functions within a federal agency are entitled to absolute immunity from damages liability for their judicial acts. Those who complain of error in such proceedings must seek agency or judicial review.* [Emphasis added.]

438 U.S., at 512–514, 98 S.Ct., at 2914–2915, 57 L.Ed.2d, at 920–921.

At the other end of the spectrum of immunity lies the concept of qualified immunity. The Supreme Court in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) quoting *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, 71 Ohio Ops.2d 474 (1974) that decided high ranking officials of the executive branch of state government were not absolutely immune from 42 U.S.C. § 1983 but were conditionally immune stated:

[I]n varying scope, a qualified immunity is available to officers of the executive branch of government, the variation being dependent upon the scope of discretion and responsibilities of the office and all the circumstances as they reasonably appeared at the time of the action on which liability is sought to be based. It is the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances, coupled with good-faith belief, that affords a basis for qualified immunity of executive officers for acts performed in the course of official conduct. 416 U.S. at 247–248, 94 S.Ct. 1683, 40 L.Ed.2d 90, 71 Ohio Ops.2d 474.

Subsequent decisions have applied the *Scheuer* standard in other contexts. In *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), school administrators were held entitled to claim a similar qualified immunity. A school board member would lose his immunity from a § 1983 suit only if "he knew or reasonably should have known that the

action he took within his sphere of official responsibility would violate the constitutional rights of the student affected, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student." Id., at 322, 95 S.Ct. 992, 43 L.Ed.2d 214. In *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), we applied the same standard to the superintendent of a state hospital. In *Procunier v. Navarette,* 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24, we held that prison administrators would be adequately protected by the qualified immunity outlined in *Scheuer* and *Wood.* We emphasized, however, that, at least in the absence of some showing of malice, an official would not be held liable in damages under § 1983 unless the constitutional right he was alleged to have violated was "clearly established" at the time of the violation.

438 U.S., at 497–498, 98 S.Ct., at 2906–2907, 57 L.Ed.2d, at 894–895.

The Supreme Court and numerous lower courts have held that there is no basis for according federal officials a higher degree of immunity from liability when sued for a constitutional infringement authorized by *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), than is accorded to state officials when sued for the identical violation under 42 U.S.C. § 1983. *Butz v. Economou, supra; States Marine Lines v. Shultz,* 498 F.2d 1146 (4th Cir. 1974); *Mark v. Groff,* 521 F.2d 1376 (9th Cir. 1975); *Apton v. Wilson,* 165 U.S. App.D.C. 22, 506 F.2d 83 (1974); *Brubaker v. King,* 505 F.2d 534 (7th Cir. 1974); *Weir v. Muller,* 527 F.2d 872 (5th Cir. 1977); *Paton v. LaPrade,* 524 F.2d 862 (3rd Cir. 1975); *Jones v. United States,* 536 F.2d 269 (8th Cir. 1976); *G. M. Leasing Corp. v. United States,* 560 F.2d 1011 (10th Cir. 1977). The Supreme Court in *Butz v. Economou, supra,* discussed this concept at length and concluded as follows:

> Accordingly, without congressional directions to the contrary, we deem it untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials. The § 1983 action was provided to vindicate federal constitutional rights. That Congress decided, after the passage of the Fourteenth Amendment, to enact legislation specifically requiring state officials to respond in federal court for their failures to observe the constitutional limitations in their powers is hardly a reason for excusing their federal counterparts for the identical constitutional transgressions. To create a system in which the Bill of Rights monitors more closely the conduct of state officials than it does that of federal officials is to stand the constitutional design on its head.

As such, the court feels that it can apply the rationale of granting absolute immunity granted to federal hearing examiners and administrative law judges in *Butz v. Economou, supra,* to Commissioners conducting a hearing of the South Carolina Beverage Control Commission. It is clear that the Commissioners conducted this hearing according to state law and denied the license to plaintiffs after a fair and impartial hearing where both viewpoints were considered. The Commission denied the license after a determination that the location was unsuitable. The court finds that the acts by the Commission were judicial in nature and were not performed in abuse of discretion. *Stump v. Sparkman, supra; Bradley v. Fisher, supra.* Therefore, defendants Pratt, Ingram, and Lowder are cloaked with the shield of absolute immunity for performing adjudicatory functions as Commissioners of the South Carolina Alcoholic Beverage Control Commission.

The court having granted summary judgment to defendant Commissioners upon the theory of absolute immunity, finds it unnecessary to address any of the other arguments put forth by defendants in support of their motion.

Defendant Sheriff Hector DeBruhl also has a motion for summary judgment upon

the grounds that there is no issue of material fact because of his immunity from the proceedings herein and that he is entitled to judgment as a matter of law.

Sheriff DeBruhl submits that he was performing informational and advocatory functions involving discretion in a proceeding before an adjudicatory body.

In this action, Sheriff DeBruhl seemed to occupy a dual status of a quasi-prosecutor and as a witness. *Butz v. Economou* addressed this proposition and stated:

We turn finally to the role of an agency attorney in conducting a trial and presenting evidence on the record to the trier of fact. We can see no substantial difference between the function of the agency attorney in presenting evidence in an agency hearing and the function of the prosecutor who brings evidence before a court. In either case, the evidence will be subject to attack through cross-examination, rebuttal or reinterpretation by opposing counsel. Evidence which is false or unpersuasive should be rejected upon analysis by an impartial trier of fact. If agency attorneys were held personally liable in damages as guarantors of the quality of their evidence, they might hesitate to bring forward some witnesses or documents. "This is particularly so because it is very difficult, if not impossible for attorneys to be certain of the objective truth or falsity of the testimony which they present." *Imbler v. Pachtman, supra* [424 U.S. 409], at 440, 47 L.Ed.2d 128, 96 S.Ct. 984 (White, J., concurring in the judgment). Apart from the possible unfairness to agency personnel, the agency would often be denied relevant evidence. Cf. *Imbler v. Pachtman, supra,* at 426, 96 S.Ct. 984, 47 L.Ed.2d 128. Administrative agencies can act in the public interest only if they can adjudicate on the basis of a complete record. We therefore hold that an agency attorney who arranges for the presentation of evidence on the record in the course of an adjudication is absolutely immune from suits based on the introduction of such evidence.

438 U.S., at 516–517, 98 S.Ct., at 2916, 57 L.Ed.2d, at 922–923.

In dictum, the Supreme Court in *Butz v. Economou, supra,* stated:

The cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process rather than its location. As the *Bradley* Court suggested, 13 Wall. (80 U.S.), at 348–349, 20 L.Ed. 646, controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another, charging the participants in the first with unconstitutional animus. See *Pierson v. Ray,* supra [386 U.S.], at 554, 87 S.Ct. 1213, 18 L.Ed.2d 288. Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.

438 U.S., at 512, 98 S.Ct., at 2913, 2914, 57 L.Ed.2d, at 919.

The court is of the opinion that Sheriff DeBruhl's actions in testifying before the Commission against plaintiffs' liquor license application comes within the protection set forth in *Butz v. Economou, supra.* Sheriff DeBruhl was acting as the spokesman for five other persons who protested against the issuance of the license. To hold him liable would have a chilling effect upon adverse parties testifying in a proceeding. This court follows the rationale of the Supreme Court in granting immunity to judges, advocates and witnesses so as to enable them to perform their respective functions without fear of harassment or intimidation.

Defendant DeBruhl's motion for summary judgment is therefore granted.

AND IT IS SO ORDERED.